## Case No. 158.
### The ALEPPO.
[7 Ben. 120.][1]

**District Court, S. D. New York. Jan., 1874.**

COLLISION—RULE OF DAMAGE—COST OF CARGO AT PLACE OF SHIPMENT—INTEREST.

1. The barque M., bound from Montevideo to Boston, was sunk in a collision with the steamer A. about twenty miles from Boston harbor. The steamer was held liable for the loss. The commissioner, to whom it was referred to compute the damages, having made his report, both parties filed exceptions to it, bringing up the question, what was the true rule of damages for the loss of the cargo, and as to the allowance of interest: *Held*, that the true rule of damages in such a case, is to allow the cost of the cargo at its place of shipment, with expenses and charges, and insurance and interest.

[Cited in Guibert v. The George Bell, 3 Fed. Rep. 585; The City of New York, 23 Fed. Rep. 619; The Umbria, 46 Fed. Rep. 927.]

[See The Mary J. Vaughan, Case No. 9,217; Dyer v. National Steam Nav. Co., Id. 4,225, modifying Id. 4,226. Contra: The Russia, Id. 12,169; Swift v. Brownell, Id. 13,695.]

2. That, where the contract price at which cargo was purchased included the expenses of putting it alongside the vessel, charges for brokerage and commissions and counsel's certificates in purchasing and shipping, if paid, and usual and necessary, are to be allowed, as part of the cost.

[Cited in The City of New York, 23 Fed. Rep. 619; The Umbria, 46 Fed. Rep. 927.]

[See The Ocean Queen, Case No. 10,410.]

3. On cargo bought generally, charges for putting the cargo alongside are allowable also. Charges for putting money at the purchase place to pay for the cargo are not allowable. Interest on the purchase price paid, from the time it was paid, is allowable, and also interest on all other allowable items. But the rate of interest allowed is six per cent.

[Cited in The Mary Eveline, Case No. 9,212; Dyer v. Nat. Steam Nav. Co., Id. 4,225.]

4. The allowance of interest in cases of tort is a matter of discretion.

In admiralty.

T. Scudder and J. C. Dodge, (of Boston,) for libellants. D. D. Lord, for claimants.

BLATCHFORD, District Judge. The bark Merrimac was, on the 20th of April, 1871, in daylight, in a thick fog, run down and sunk, with her cargo, by the steamer Aleppo, at a point about twenty miles from Boston harbor, and about half that distance from Boston lighthouse. She had come, with her cargo, from Montevideo, and was bound to Boston. On a libel filed by the owners of the bark, and of her pending freight, and by the owners of property and cargo on board of her, and by her officers and crew, to recover the value of the bark, and of such freight and property and cargo, and of the effects and clothing of the officers and crew, and the amount of the wages lost by the officers and crew, in consequence

of the sinking of the bark, with said cargo and other property, this court held [The Aleppo, Case No. 157] that the steamer was solely in fault for the collision, and rendered a decree that the libellants recover against the steamer the damages sustained by them by reason of the collision, and that it be referred to a commissioner to ascertain and compute the amount of such damages. The report of the commissioner has been made. It is not questioned in any particular by either party, except as to its conclusions respecting the amount of damages by the loss of the cargo, and respecting interest.

The commissioner reports that it was contended on the part of the libellants, owners of cargo, that they are entitled to be paid the market value thereof in Boston, at the time when it was lost, less duties, freight and charges for landing, with interest at 7 per cent. per annum from the date of the loss, being the sum of $112,147.76, as shown by schedule No. 1 annexed to the report. He further reports that the claimants insisted that the damages should not exceed the actual cost of the cargo at its port of shipment (part having been shipped at Colonia and part at Montevideo), with expenses of lading, and that the interest should not exceed 6 per cent. per annum from the time of the loss, being the sum of $68,558.34, as shown by schedule No. 2, annexed to the report. He further reports that he has refused to adopt either of the rules above stated, but has allowed to the libellants the actual cost of the cargo, with expenses of lading on board, and such increase in the market value at the port of shipment as occurred previous to the loss of the vessel, with interest at 7 per cent. per annum from the time of the loss, being the sum of $81,378.46, as shown by schedule No. 3, annexed to the report.

The libellants except to the report, because the commissioner refused to adopt the rule so contended for by them, and because he made the allowance which he did make. The claimants except to it, (1) because he has allowed for the value of the cargo more than its market value at the port of shipment, with interest at 6 per cent. per annum; and (2) because he has allowed to the libellants, in addition to the actual cost of the cargo, an increase in its market value occurring prior to the date of the loss; and (3) because he has allowed 17½ per cent. on the cost of the cargo belonging to three of the owners of cargo, without stating the ground on which such allowance is made; and (4) because there is no evidence to sustain such allowance of 17½ per cent.; and (5) because he has allowed 2½ per cent. on the cost of the cargo belonging to another owner of cargo, for rise in value from the time of purchase to the time of loss; and (6) because he has allowed premiums of insurance in addition to cost and increase in market price to the

[1][Reported by Robert D. Benedict, Esq., and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

time of loss; and (7) because he has allowed, in addition to the cost of cargo and increase in market value to the time of loss, charges for purchasing and shipping cargo, expenses of classification, consul's certificates, commissions for drawing exchange, brokerage on sale of exchange, interest on cost between time of payment and reimbursement by exchange, London bankers' commission and premium of exchange, and because such items are especially improper if the libellants are allowed the market value at the time of the loss; and (8) because he has allowed on the cargo belonging to three of the owners of cargo, the difference between the purchase money and the whole cost of such cargo on board, and because such items are especially improper if the libellants are allowed the market value at the time of the loss; and (9) because he has allowed interest, and at the rate of 7 per cent. per annum, on all the items allowed in his report, as well as on those found in schedule No. 3, no evidence having been given of payment, or loss, of interest, or of any other circumstances justifying the allowance of it, and also because the rate of interest in this court is only 6 per cent. per annum.

The report of the commissioner, in connection with schedule No. 3, shows that he has allowed, as damages, to the four owners of cargo, the actual cost of the cargo, with the expenses of lading on board, and such increase in the market value thereof at the port of shipment, as occurred previous to the loss of the cargo, with interest at the rate of 7 per cent. per annum. The cargo was wool. As to each one of three of the owners, schedule No. 3 shows that the mode adopted of arriving at the amount reported was this: Set down the cost, in gold, of the purchase of the wool, "without charges of shipment or other expenses;" to this add 11½ per cent. thereon, for gold premium; to the resulting sum add 17½ per cent. thereon (for what, is not stated in the schedule); to the resulting sum add an item as "difference between cost of purchase and whole cost of wool on board in currency," and an item as "cost of insurance," and an item as "interest from April 20th, 1871, at 7 per cent." This mode produces allowances to the three owners, severally, of $17,501.65, and $29,038.18, and $29,207.62. As to the fourth owner, schedule No. 3 shows that the mode of arriving at the amount reported was this: Set down the cost, in Montevideo paper currency, of the purchase of the wool; to this add 2½ per cent. thereon, as "rise in value from time of purchase to time of loss," and 1 6-10 per cent. thereon, as "commissions, &c.," and an item as "cost of shipment;" to the resulting sum (which is put down as "total cost, in Montevideo currency") turned into gold at 92 97-100 per cent. thereon, add an item, as "insurance paid, in gold;" to the resulting sum add 11½ per cent. premium thereon; to the resulting sum (which is put down as "total in United States currency") add "interest from April 20th, 1871, at 7 per cent." This mode produces an allowance to the fourth owner of $5,541.01.

The exceptions raise the question, whether the allowance for loss of cargo ought to be the market value of it in Boston at the time of the loss, less freight, duties, and charges for lading; or, whether it should be only the actual cost of the cargo when on board of the vessel at the port of shipment (including expense of lading), which may be regarded as its market value when on board, at such port, without any addition for any increase in the market value of like cargo at such port, occurring prior to the time of the loss; or whether it should be what the report allows, namely, the actual cost when on board of the vessel, at the port of shipment (including expense of lading), with the addition of the increase in the market value of like cargo at such port, occurring prior to the time of the loss. The cases in which the question is considered are few in number. The general rule, in cases of collision, is easily stated. In The Gazelle, 2 W. Rob. [Adm.] 279, it is said, that "the right against the wrong-doer is for a restitutio in integrum," and that the suffering party must be put "as nearly as possible in the same situation in which he would have been if no collision had taken place." In Smith v. Condry, 1 How. [42 U. S.] 28, it is said: "It is the actual damage sustained by the party at the time and place of the injury, that is the measure of damages." In Williamson v. Barrett, 13 How. [54 U. S.] 101, 110, it is said: "The general rule regulating damages in cases of collision is to allow the injured party an indemnity to the extent of the loss sustained. This general rule is obvious enough; but there is a good deal of difficulty in stating the grounds upon which to arrive, in all cases, at the proper measure of that indemnity." But the question remains—what sum of money, in the given case, will be a restitutio in integrum, a replacing of the actual damage, an indemnity to the extent of the loss. Whatever that sum is, it must be fixed, as nearly as may be, as of the time and place of the loss.

The general principle, in cases of cargo lost or damaged by collision, is thus stated in Lowndes on Collisions (page 157): "If, by reason of collision, the cargo on board is lost or damaged, the owner of it is entitled to compensation for his actual loss; that is to say, to the sum for which such cargo would have been sold had there been no collision, minus such expenses as must, in that case, have been incurred in order to realize the proceeds, and deducting also the sum for which it may have actually been sold."

In Murray v. The Charming Betsy, 2 Cranch, [6 U. S.] 64, in 1804, which was the case of a seizure of a vessel and cargo, by

a United States frigate, as forfeited for a violation of a non-intercourse law, the supreme court, in declaring the seizure to have been illegal, and holding the owner of the vessel and cargo to be entitled to damages for the seizure (the cargo having been procured at St. Thomas, and the vessel and cargo having been seized at sea, and carried into Martinique, and the cargo having been sold at Martinique, by the captain of the frigate, and the vessel having been brought into Philadelphia, and there libelled), decided that the damages for not restoring the vessel and cargo at Martinique should be the actual prime cost of the vessel and cargo, with interest thereon, including the insurance actually paid and such expenses as were necessarily sustained in consequence of bringing the vessel into the United States.

In the case of The Lively, [Case No. 8,-403,] in 1812, Judge Story says, that "in cases where the vessel and cargo have been captured, and afterwards lost to the owner, the supreme court of the United States have confined themselves to the prime value thereof, and interest thereon, to the judgment." He also says: "I am not aware of a single authority in the higher courts of admiralty, in which supposed profits have formed an item of damage in cases of restitution. * * * I have not been able to trace in later reports a single instance where loss of profits has been allowed." He then examines the question upon principle, and comes to the conclusion that an allowance of damages upon the basis of a calculation of profits is inadmissible, and says, that such a rule has been rejected by the courts of law in ordinary cases, and that, instead of deciding upon the gains or losses of parties in particular cases, a uniform interest has been applied, as the measure of damages for the detention of the property. Much of his reasoning applies as well to the loss of cargo in a case of collision as to a case of illegal capture, which was the case before him. A calculation of profits involves uncertainty, and proceeds upon the contingencies of the market, and is a calculation upon conjecture, and would work injustice if applied to the case of a bad market and a loss thereby, and would be a rule which would always work substantially one way, and would fall heavily on the innocent owner of a colliding vessel held in fault for the negligence of her master. All these considerations lead to the conclusion that profits, on the supposition of the prosperous termination of the voyage, ought not, in any case, to constitute an item of damage.

The case of The Anna Maria, 2 Wheat. [15 U. S.] 327, in 1817, was one of marine trespass by a privateer, where a vessel and her cargo were unlawfully captured and sold. The supreme court awarded, as damages, the value of the vessel, and the prime cost of the cargo, with all charges, and the premium of insurance, if paid, with interest.

The case of The Amiable Nancy, 3 Wheat. [16 U. S.] 546, in 1818, was one of marine trespass by a privateer, in the seizure and detention of a vessel and her cargo. In rejecting an item for the loss of the supposed profits of the voyage on which the vessel was bound, the supreme court say: "The probable or possible benefits of a voyage as yet in fieri, can never afford a safe rule by which to estimate damages in cases of marine trespass. There is so much uncertainty in the rule itself, so many contingencies which may vary or extinguish its application, and so many difficulties in sustaining its legal correctness, that the court cannot believe it proper to entertain it. In several cases in this court, the claim for profits has been expressly overruled; and in Del Col v. Arnold, 3 Dall. [3 U. S.] 333, and The Anna Maria, 2 Wheat. [15 U. S.] 327, it was, after strict consideration, held, that the prime cost or value of the property lost at the time of the loss, and, in case of injury, the diminution in value by reason of the injury, with interest upon such valuation, afforded the true measure for assessing damages. This rule may not secure a complete indemnity for all possible injuries, but it has certainty and general applicability to recommend it, and, in almost all cases, will give a fair and just recompense." In allowing interest in this case, the supreme court fixed the rate at six per cent.

The case of Smith v. Condry, 1 How. [42 U. S.] 28, in 1843, was one of a collision between two American vessels in the port of Liverpool. The injured vessel had a cargo of salt, and was ready to sail for the United States. She offered to prove that, if she had not been prevented from sailing by the injury complained of, she would have arrived at her port of destination with her cargo in season to have obtained more for it than she received. The evidence was rejected. The supreme court say: "It has been repeatedly decided in cases of insurance, that the insured cannot recover for the loss of probable profits at the port of destination, and that the value of the goods at the place of shipment is the measure of compensation. There can be no good reason for establishing a different rule in cases of loss by collision. It is the actual damage sustained by the party at the time and place of the injury that is the measure of damages."

In Williamson v. Barrett, 13 How. [54 U. S.] 101, in 1851, the court considered the question, in a collision case, of the allowance to the injured vessel of compensation, during the time necessary to repair her and fit her for business for the loss of what she would have produced by chartering her to run in the business in which she had usually been engaged. The court followed the principle of the decision in the case of The Gazelle, 2 W. Rob. [Adm.] 279. It

conceded that the earnings of a vessel not under a charter party must, in some measure, depend upon the contingency of obtaining employment for her, but it held that the market price of her hire afforded a proper rule for estimating the damage sustained on account of the loss of her service. Three of the judges dissented, holding that the case fell within the rule, that, in cases of marine torts, no damages could be allowed for the loss of a market, or for the probable profits of a voyage. The opinion of the court was delivered by Mr. Justice Nelson.

The case of The Ocean Queen, [Case No. 10,409,] in this court, in 1866, was one of collision, where a schooner on a voyage from Baltimore to Providence, with a cargo, was, with such cargo, sunk at sea, by a collision. The commissioner, in assessing the damages to the cargo, took the price it would have brought at the port of destination, instead of the price paid at the port of shipment. The claimants excepted to the report. This court (Shipman, J.) said: "I think the exception on this point is well taken. It is open to the objections stated by Mr. Justice Story, in the case of The Lively, [Case No. 8,403.] Though that was not a case of damage by collision, it was a case of damage by another kind of tort. His remarks are, therefore, apt and to the point. To estimate the damages by what the cargo would have sold for, if it reached the port of destination, partakes, in some measure, of conjecture, and assumes that for certain which is, after all, contingent. The schooner, in this case, might never have reached her port of destination, even if she had not collided with the Ocean Queen. She was exposed to all the ordinary perils of navigation—collision, fire, and the numberless dangers which attend vessels on the sea. I understand the correct rule to be laid down by the supreme court of the United States, in Smith v. Condry, 1 How. [42 U. S.] 28, which is, the value of the goods at the port of shipment. To this should be added the expense of navigating the vessel to the place where the collision occurred, including also the lading of the cargo on board. On this amount, the libellant is entitled to interest at six per cent. from the time of the collision." On appeal to the circuit court by the claimants, that court (Nelson J., 5 Blatchf. 493, [The Ocean Queen, Case No. 10,410,]) in 1867, said: "The only question worthy of notice is that of damages in respect to the cargo. The owners of the cargo claim that they are entitled to the market value of the cargo, consisting of flour, corn and feed, at the port of destination, Providence, or, at least, to the general increased market value that took place between the time of the shipment at Baltimore, and the time of the collision. The court below held, that the damages should be ascertained from the value of the goods at the port of shipment, including all expenses of transpor-

tation to the place of collision, and of the lading of the cargo on board, &c., together with interest, at the rate of six per cent. per annum, from the time of the collision. This is the rule, substantially, as settled in the case of The Anna Maria, 2 Wheat. [15 U. S.] 327, and in Smith v. Condry, 1 How. [42 U. S.] 28, 35, as governing in all cases of marine torts. See, also, The Lively, [Case No. 8,403.]

The case of The Vaughan and The Telegraph, in this court, [Case No. 9,217,] in 1867, was a case of the loss of a cargo of barley, on the Hudson river, between Newburgh and Cold Spring, by a collision, the barley being in transit on a canal-boat from Canada to New York. The commissioner, in computing the damages for the loss of the barley, took, as its value, the price at which other barley, on another boat in the same tow, was sold at New York, a few days after the collision, deducting therefrom the commission for the sale, and the freight on the barley, and adding interest on the remainder at seven per cent. per annum. The claimants excepted to the report, on the grounds that the commissioner should not have taken the value at New York, or at the place of collision, but should have taken it at the place of shipment, and that the proper rate of interest was six per cent. per annum, and not seven. In disposing of the case, I referred to the authorities above cited, and said: "The law is well settled, that, in case a contract to deliver goods is broken, the party is entitled to recover the full value of the goods at the place of delivery. * * * But in cases of loss of cargo by collision, or other tort, the rule is equally well settled, that the value of the lost property at the time and place of its shipment is the measure of damages." I held the commissioner to have erred in not adopting, as the measure of damages, the value of the barley at the port of shipment, and in allowing interest at seven per cent. and not at six. The circuit court, on appeal, (Nelson, J.,) concurred in the view, that the proper rule of damages, in respect to the cargo, was its value at the port of shipment. The supreme court, in its opinion in the case, on appeal, (14 Wall. [81 U. S.] 258, 267,) says: "In the district court, it was held, that the proper rule of damages where a cargo is lost in transitu by a collision, or other tort, is the value of the goods at the time and place of shipment. It was conceded, that, upon the breach of a contract for the delivery of goods at a particular place, the measure of damages is the full value of the goods at such place. Both propositions are correct and are well settled in our jurisprudence."

The libellants, in supporting their exception, contend that the proper measure of damages is the market value of the wool in Boston, on the day of its loss, less duties, freight and charges for landing, and less, also (an item not referred to in their ex-

ception, or before the commissioner) the reasonable cost of insuring the cargo from the place of loss to Boston. They insist that this would give the value of the cargo at the time and place of its destination, and would be in accordance with the rule laid down in Smith v. Condry, [supra.] But this construction of the rule would fritter it away altogether. The value at Liverpool, of a cargo lost by collision in the port of Liverpool, bound to Boston, would be ascertained by taking its market value at Boston, and deducting duties, freight, expenses of landing and insurance. This might give the very profits which were refused in Smith v. Condry.

It is urged for the libellants, that this cargo was lost but a few miles from Boston. But it was lost at a point where, as the facts show, there was greater peril than in the whole voyage. If the barque had not been run down by the Aleppo, she might have been run down during the same fog by some other vessel, nearer to Boston. If she had collided one mile further from Boston with some other vessel, in a fog, and her cargo had been lost thereby, its owners might, with equal force, have contended for the rule they now contend for. Yet it is shown that equal peril exists one mile nearer Boston, in a fog. The contingency of a safe arrival at Boston, in a case like the present, is purely a matter of conjecture.

It is contended, by the libellants, that Smith v. Condry, [supra,] is overruled by Williamson v. Barrett, [supra,] if the former case is to be considered as laying down the rule, that increased values or expected profits or earnings can never be allowed as damages in collision cases. It is sufficient to say, that the supreme court and the judges who concurred in the opinion of the court in the latter case, have never regarded the latter case as overruling the former. Mr. Justice Nelson, who delivered the opinion of the court in the latter case, cites the former case, in The Ocean Queen, [supra,] as settling the rule which is to govern on like questions in all cases of marine torts. In the case of The Vaughan and The Telegraph, [supra,] the supreme court sanction the rule which, in the same case, I had, on the authority of Smith v. Condry, [supra,] adopted; and, in the very next case in the same volume, (The Cayuga, 14 Wall. [81 U. S.] 270,) the same court maintain the doctrine of Williamson v. Barrett, [supra,] that reasonable demurrage, for unavoidable detention while repairing an injured vessel, is a proper charge in all suits for damages by collision.

It seems to me impossible, either on principle or on authority, to admit the rule of damages contended for by the libellants. That rule was not departed from in the case of The Russia, [Case No. 12,169,] where the value at New York, of a cargo which had arrived from a foreign port, and was damaged by a collision on board of a vessel at her anchorage in the harbor of New York, less freight and duties, was allowed; or in the case of The Alabama, [nowhere reported,] in this court, where the value at New York, of a vessel which had arrived from a foreign port, and was owned there, and was damaged by a collision in the harbor of New York, off Staten Island, was allowed. The principle of these allowances was, that the property was not in transitu, but was, substantially, at New York, as a market.

It is equally impossible to sustain the rule of damages adopted by the commissioner. The general increase in market value, between the time of shipment and the time of the collision, was claimed and disallowed by the circuit court for this district, in the case of The Ocean Queen, [supra.] I should feel bound by that decision, so long as it was not overruled, even if I did not concur in its propriety. But it seems to me a correct decision. No principle of restitutio in integrum, or of putting the suffering party as nearly as possible in the same situation in which he would have been if no collision had taken place, or of giving him the actual damage sustained by him at the time and place of the injury, or of giving him indemnity to the extent of the loss sustained—as the general rule is thus variously expressed —requires or admits an allowance made on the principle adopted by the commissioner in this case. It is true, that the place of the loss was not Montevideo, and that, at the time of the loss, like wool with that composing this cargo may have been worth more in the market at Montevideo than it cost the libellants to buy this wool. In a strict sense, there was no market, at the place of the loss, for the sale of the wool, but it had for the libellants the value of the money which they had expended upon it, in procuring it and lading it and transporting it to the place where it was lost, with interest. It had, however, no further value to them, at that place, and their actual loss was nothing more than such money, with interest. Restoring to them that money, with interest, restores all they actually lost. All beyond that was expected profits. The wool was not in Montevideo, so as to have applied to it any increase in market value, after it left there, which might have applied to it if it had remained there and been sold. The increase in value after it left there, and while it was on the voyage, based on an increase in the value there of like wool, is as much contingent as an increase in its value based on a price of like wool in Boston, at the time of the loss, higher than the price paid in Montevideo. The value of the wool to these libellants at the time and place of the loss, was only what it cost them to buy it and convey it to the place of loss, with interest. So, too, they cannot be allowed for any increase in market value at Montevideo or other place of purchase or shipment, be-

tween the time of purchase and the time of shipment. The rule is one which must operate uniformly in all cases. If there had been, between the time of purchase and the time of shipment a fall in the market value of the wool at the foreign place, it would be unjust to deprive the libellants, for that reason, of a part of the money they had actually expended on the wool. The risk of a bad market, whether at Montevideo or Boston, is one which the law will not throw on the libellants, so as to make them suffer by it; and, on the same principle, the owners of a vessel whose master, by an act of negligence, makes such vessel or her owners responsible for a marine tort, ought not to be compelled to pay the profits or increase which a good market might have afforded, if the tort had not been committed. It was the force of these principles, which led the supreme court, at an early day, to adopt the rule of prime cost of cargo, and expenses and charges, and insurance, and interest, in cases like the present, and has induced it to adhere to such rule.

The item of insurance paid on the cargo is a proper item to be allowed, if properly proved. It is a part of the cost of the cargo, on board of the vessel, at the place and time of the loss. On wool, where the contract price included the expenses of putting the wool alongside of the vessel, charges for brokerage and commissions and consul's certificates, in purchasing and shipping, if paid, and if usual and necessary expenses, are proper, as part of the cost of the wool on board. On wool bought loose, the above charges are proper, and also charges for receiving and shipping, baling, cartage and lighterage, labor, custom house duties and charges, stamps, and classification, if paid, and if usual and necessary expenses. Charges for placing money at the purchase place to pay for the wool are not proper—such as commission for drawing bills of exchange, and London banker's commission, and brokerage on sale of exchange, and premium of exchange. Nor is the item of interest on the cost of the wool between the time of paying for it and the time of reimbursement by exchange, allowable, in that shape. Interest, however, on the purchase price paid, from the time it was paid, is allowable. So, also, interest is allowable on all other allowable items proved and paid. But such rate of interest on all the items in regard to the cargo must be six per cent., and not seven.

The claimants except because the commissioner has allowed interest on all the items in his report, as well as on those relating to the cargo, and also, because, in allowing it, he has taken seven per cent., and not six. I do not see why interest should not be allowed from the time of the loss on the value of the vessel, and of her net freight, and of provisions, and of the

chronometer, and of the clothes, money and effects of the officers and seamen, and, from May 16th, 1871, on the amounts allowed in the nature of wages to the officers and seamen. But the rate of interest must be six per cent., and not seven.

As to interest on money paid out by the libellants, there can be no proper objection to its allowance. As to interest on the other items above referred to, interest is not allowable as a matter of law, except in cases of contract, or the unlawful detention of money. In cases of tort, its allowance as damages is a matter of discretion. Lincoln v. Claflin, 7 Wall. [74 U. S.] 132, 139. It seems to me a proper allowance in this case on the items referred to. Allen v. Mackay [Case No. 228;] Egbert v. Baltimore & O R. Co., [Id. 4,305.]

In admiralty, in cases of collision, where interest is allowed, it ought to be a uniform rate, and not one varying with the laws of the states. Hemmenway v. Fisher, 20 How. [61 U. S.] 255, 259. Such rate of interest, in collision cases tried in this court, has been and is six per cent., except, that, on money paid out here, for repairs made here, interest according to the law of this state has, in some cases, been allowed. This rate of six per cent. was fixed at an early day, in analogy, perhaps, to the rate fixed by act of congress as the rate on bonds for duties to the United States. Act March 2, 1799, § 65, 1 Stat. 677. It is the rate which the supreme court has allowed in cases of this kind.

The third exception of the claimants is technically correct and must be allowed. The other exceptions of both parties are disposed of in accordance with the views hereinbefore expressed, and the case must be referred back to the commissioner to be adjusted accordingly.