### THE SILVER STAR.

#### (District Court, D. Maine. August 9, 1913.)

#### No. 208.

SALVAGE (§ 26*)—WRECKING SERVICES PERFORMED UNDER CONTRACT—COMPENSATION.

Where libelant performed wrecking services in raising a sunken steamer at the request of the owners, using in the work apparatus which was costly, expensive to maintain, and infrequently used, it is entitled to compensation at a rate beyond the customary charge for ordinary maritime services.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 57–64, 68, 84; Dec. Dig. § 26.*]

In Admiralty. Suit by the Snow Marine Company against the steamer Silver Star. Decree for libelant.

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Arthur S. Littlefield, of Rockland, Me., for libelant.
William H. Gulliver, of Portland, Me., for claimant.

HALE, District Judge. This libel is for salvage services rendered in raising and saving the steamer Silver Star. The libelant is an owner of lighters, towboats, and wrecking apparatus. It now waives its claim for salvage and seeks to recover only reasonable compensation for services in July, 1910, for the use of its wrecking apparatus in getting the steamer off a ledge where she was sunken and heeled towards deep water on the easterly side of the island of Isleboro. The Silver Star is a steamer of 75 gross tons and 42 net tons. On the morning of July 23, 1910, W. S. Pendleton, of Isleboro, agent of the steamer Silver Star, telephoned to Capt. Snow, president of the Snow Marine Company, to engage the company with its wrecking apparatus to get the steamer off the ledge. The proofs show that Capt. Snow told Mr. Pendleton by telephone that he would not enter upon the service for $50 a day; that being the price he had charged for services in another case. Capt. Snow was then asked to bring his whole wrecking gear. He testifies:

"I told him I should charge him from the time I left Rockland until I got back and charge him for my wrecking outfit proportionately."

A letter from Capt. Snow to Mr. Pendleton, written December 22, 1910, shows something of the character and extent of the services:

"You called us at 8 a. m. June 23, 1910; we started at 9 a. m. to get our outfit and extra crew, left for Hewes Point at 12:15 p. m., arrived at wreck at 4:30 p. m. Worked until 8:45 p. m.; Friday June 24th, worked from 4 a. m. until 11:50 p. m.; Saturday left for Rockland 7 a. m. after taking up moorings and got the outfit put away at 10:45.

"This about uses up the 23d, 24th, and 25th. You had the use of our whole outfit and we worked with dispatch and almost continuously until the hull was where you wanted her. We dropped all our work and came to your work. We maintain this pump and wrecking gear at considerable expense, and those who use it must expect to pay something more than an ordinary service."

The case is to be determined upon the basis of reasonable compensation only for the services rendered. The libelant claims, however, that, in performing the services, it was necessary to put the lighter to unusual and unaccustomed strain; and that the libelant should have compensation commensurate with the difficulty and extent of the work undertaken. In Gilchrist v. Godman (D. C.) 79 Fed. 970, Judge Grosscup dealt with a case involving wrecking services. In the case before him he holds that the relation of libelants to the vessel in distress was not that of salvors at large, but that it involved a claim of a class of men who worked for certain customary wages and independently of the success or failure of their efforts; and that the claim is maritime in its character. He says:

"It will be observed that the relation of the libelants to the vessel in distress was not that of salvors at large. They did not offer their help or impose their services. * * * Their relation was not that of men coming at a venture to a vessel in distress but of regular wreckers and tug men, who were employed at a customary compensation to give assistance."

In finding what such "customary compensation" should be, it is necessary to consider some matters which do not enter into ordinary maritime services. The fact is worthy of note in wrecking services, as in salvage, that a "costly instrumentality" is brought into use. The Blackwall, 10 Wall. 1, 13, 19 L. Ed. 870. In The Newaygo (D. C.) 205 Fed. 178, 180, the District Court for the Eastern District of Michigan in a wrecking case allowed a claim in which the value of wrecking services was estimated at a rate beyond ordinary maritime services.

In the case before me, the time employed was about 30 hours, involving some night services and extending over a part of four days. It appears from the testimony that it cost $31 a day for all the working days of the year to pay the running expenses of the lighter, aside from the use of the pump and all other wrecking apparatus. It is claimed by the libelant that it has sometimes let the pump for $25 a day. The claimant admits that $200 is a reasonable compensation but says he should not reasonably be expected to pay $300.

There is a conflict of testimony as to the value of the services. It is unnecessary to discuss all the evidence in detail. The services were of an extraordinary character; and it is clear that a price should be charged higher than for ordinary services. The apparatus is of large value, about $11,000, and is maintained at great expense, with only occasional opportunity to use it. Persons engaged in wrecking services ought to keep up proper apparatus and be ready at any time to use their best efforts. I do not think the charge is unreasonable under all the circumstances. A decree may be entered for the libelant for $300. The libelant may recover costs.