## THE NELLIE.

### CAMPBELL et al. v. WETHERILL.

(District Court, E. D. Pennsylvania. May 12, 1904.)

### No. 56.

1. WHARVES—LIABILITY OF OWNER—INJURY OF VESSEL FROM OBSTRUCTION ON BOTTOM.

A few feet in front of a wharf owned by respondent there was a piece of submerged piling about 18 inches high, and the person who built the wharf placed fenders in front running diagonally from the top of the wharf to the bottom of the river to keep vessels from being damaged on such piling. Libelants' barge laden with coal for respondent tied up at the wharf, and, having settled against the fenders as the tide ebbed, one of them was pulled up by the master and respondent's manager, and the barge settled on the pile and was injured. The master was given no notice of the obstruction, nor was its existence known to respondent, who never inquired why the fenders were placed there. *Held*, that he was liable for the injury, it being his duty to know of the obstruction, and to warn vessels using the wharf of the same.

2. CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.

The defense of contributory negligence on the part of libelants, when relied upon, must be affirmatively proven by a preponderance of evidence.

In Admiralty.

Willard M. Harris, for libelants.

Henry R. Edmunds, for respondent.

HOLLAND, District Judge. Libelants brought this action to recover damages caused to their barge Nellie while lying at the wharf of respondent, located in front of his Club House, along the Cohansey creek, in the state of New Jersey. She was loaded with 175 tons of coal, consigned to the respondent, and arrived there on May 31, 1903, at 4 o'clock p. m. The Nellie is a steam barge, of regular canal boat build, flat bottom and round bilge, 96 feet long, 22½ feet beam, and on this date was drawing 8 feet 4 inches aft and 7 feet 6 inches at the bow. The barge was moored with bow up stream and starboard side to the wharf. Capt. Campbell had been to this wharf, with the same barge, not long before, with a car load of dirt, and at the time was aware of the fact that he would soon be required to revisit the place for the purpose of delivering the boat load of coal, at the request of re-

spondent, for which he had the order at the time. He therefore made soundings about the wharf and the boat for the purpose of ascertaining the nature of the bottom so that he would not strain her in case she grounded at the time the coal was delivered. As to the nature of the bottom of the river in front of the wharf, there is very little dispute. He found that there was a slight descent from the wharf outward. Actual measurements subsequently demonstrated this to be 2½ feet in 30. The bottom was of a firm nature, composed of coarse gravel up to the face of the wharf, over which there flowed 12 feet of water at high tide and 6 feet at low tide. The wharf had been rebuilt some time prior under the supervision of Capt. Woodruff, who was at that time the manager for respondent, and was called as a witness in this case. Capt. Woodruff ascertained by sounding that about 7 feet 6 inches out into the stream from the upper end of the wharf there projected a submerged piling about 18 inches in height. To protect vessels from taking damage on this snag, he placed two fenders, one at the upper and one at the lower point of the wharf, resting on the cap log, and extending out about 13 feet into the stream. The upper fender was about 21½ feet long, and rested upon the bottom 13 feet out from the piling as originally placed by Mr. Woodruff. No other wharf along the Cohansey river was equipped with these fenders, and it was generally thought by watermen (including Capt. Harris, who was in charge of the barge at the date of delivery of the coal) who saw the arrangement that they were placed there for the purpose of keeping vessels off from the wharf or irregular bottom. The respondent asserts that he knew nothing about the submerged piling, and supposed the fenders were there to keep vessels off from the wharf, although he had directed his own manager to rebuild this wharf some time in 1900, and did not inform himself from that time until the date of the damage as to the true condition of the bottom of the river at the face of the wharf, or the real reason for which the fenders had been placed there. Under these circumstances the Nellie arrived, as has been said, on May 31, 1903, at 4 o'clock, on an ebb tide, and proceeded to tie up to the respondent's wharf. Two spring lines were put out (one from the bow, one from the stern), a stern line to a stump on the bank, two lines from the Sampson post (one off to a post on the wharf, and the other upstream from the bow to a tree). The last-mentioned line was the line belonging to respondent, and had been handed to one of the deck hands for use by Mr. Gandy, respondent's manager, who succeeded Woodruff, and had been used for mooring the respondent's yacht. About two hours after the barge arrived, Capt. Harris was informed by Mr. Gandy that his boat was listing to port, and upon examination he found she was resting upon something on the bottom. The two men moved the fender and pulled it up. They attempted to back the barge, but were unable to do so. Upon subsequent examination it was found the submerged piling had penetrated the bottom. No warning had been given Capt. Harris by the respondent or any of his employés, nor is there sufficient evidence to charge libelants with a want of due care in mooring the barge, or of a failure to exercise proper supervision for the safety of the boat up to the time they discovered she had listed, unless it be, as claimed by the respondent, that he permitted the lines to become taut,

thereby preventing her from sliding down the fenders as the tide receded, and this amounts to contributory negligence and a good defense.

It appears that Mr. Gandy informed the captain the boat had listed. It was found that the bow line running to the tree was taut, and the two spring lines were in the same condition. These, however, were put out for the purpose of preventing the barge from moving fore or aft; and, as explained by Mr. Gandy, the bow line to the tree would naturally be tight, owing to the ebb of the tide sweeping down against the bow. As to the bow line off to the wharf, there was some dispute as to its being taut or slack, but upon the whole evidence the court is led to the conclusion that it was as slack as the conditions reasonably suggested to a careful master.

The respondent was negligent in inviting the libelants to his wharf without providing a safe berth thereat, and his indifference as to the condition of the wharf and the reason for which the fenders were placed there by his manager will not exempt him from liability for any damage done in this case. The rule of law in cases of this kind is very plain, and established by a long line of decisions. In Moorcock, L. R. 13 Prob. Div. 157, defendants, who were wharfingers, agreed with plaintiff for a consideration to allow him to discharge his vessel at their jetty, which extended in the River Thames, where the vessel would necessarily ground at the ebb of the tide. The vessel sustained injury from the uneven condition of the bed of the river adjoining the jetty. Defendants had no control over the bed, and had taken no steps to ascertain whether it was or was not a safe place for the vessel to lie upon. It was held that, though there was no warranty, and no express representation, that there was an implied undertaking by defendants that they had taken reasonable care to ascertain that the bottom of the river at the jetty was not in a condition to cause danger to a vessel, and that they were liable. This case was quoted and approved by Chief Justice Fuller in delivering the opinion of the Supreme Court of the United States in Charles G. Smith et al. v. Charles Burnett et al., 173 U. S. 430, 19 Sup. Ct. 442, 43 L. Ed. 756.

Respondent had the ready means of obtaining information as to the condition of the bottom, but he took so little interest in the unusual fact of the existence of the fenders at his own wharf that he never inquired of his own manager, who knew all about it.

The defense of contributory negligence on the part of the libelants, when relied upon, must be affirmatively proven by a preponderance of evidence. Railroad Company v. Gladmon, 15 Wall. 401, 21 L. Ed. 114; Railroad Company v. Horst, 93 U. S. 291, 23 L. Ed. 898. It was not necessary for the libelants to show that the respondent was aware of the existence of the submerged piling which occasioned the injury of the barge. It suffices to charge the respondent with negligence that he could have discovered if he had exercised proper care to inform himself of the condition of the bottom. Smith v. Havemeyer (C. C.) 36 Fed. 927.

In the absence of warning as to the real reason of their existence, boatmen lawfully using the wharf cannot be considered negligent because they make an erroneous guess as to why the fenders were placed there.

There is nothing in the evidence to show that the mooring was not reasonably and carefully done by Capt. Harris in view of all the surroundings, and as he knew them, and could reasonably judge them from the conditions existing at that wharf at that time. The respondent says that, in his opinion, this accident occurred "by the vessel being held too tight in against the wharf with the lines, and that she pushed the foot of the skid into the water until the bilge rested upon the submerged pile. Then the tide still going further relieved the weight upon the skid, the pile holding the bilge of the vessel." He further states that it would be necessary that this skid should have been pushed into the gravelly bottom in a lateral position to the extent of three feet. This explanation is unsatisfactory. Aside from the fact that the bottom was such as to preclude the idea of the skid being sufficiently strong to endure the weight to drive it down to the extent required, it seems almost incredible that two men could have pulled it up.

The evidence that vessels and the yacht of the respondent has used this wharf for some time with safety was valuable only to show that under certain circumstances it could be used without occasioning injury to vessels using it, but was quite unimportant when it appeared beyond doubt that there were defects capable of producing mischief, which could have been readily discovered and remedied by a proper examination and inquiry by the owner. Smith v. Havemeyer (C. C.) 36 Fed. 927.

A decree is entered for the libelants, with an order of reference to assess damages.